UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

YONG KI HONG and HWAN MEDIA, INC.,    :
    :
                Plaintiffs,    :
    :
    -against-    :   __MEMORANDUM AND ORDER__
    :
KBS AMERICA, INC., CHANG JOON LEE,    :   05-CV-1177 (ENV) (VMS)
JOSEPH KONG, SPRING VIDEO & GIFT, INC.,    :
and YANG JOONG KIM, d/b/a HAN KOOK    :
VIDEO,    :
    :
                Defendants.    :

-----------------------------------------------------------------x

VITALIANO, D.J.

      Plaintiffs Yong Ki Hong and Hwan Media, Inc. commenced this action

against defendants KBS America, Inc. ("KBSA"), Chang Joon Lee ("C.J. Lee"),

Joseph Kong, Spring Video & Gift, Inc. ("Spring Video"), and Yang Joong Kim,

d/b/a Han Kook Video, alleging federal antitrust violations under sections 1 and 2 of

the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiffs, owners of a Queens-based store

that rents Korean videotapes, claim that defendants engaged in an unlawful

horizontal price-fixing scheme and group boycott in order to monopolize the market

for Korean videotapes and prevent plaintiffs' store from competing in that market.

Plaintiffs also assert New York state law causes of action under the Donnelly Act,

N.Y.G.B.L. §§ 340 *et seq.*, the Deceptive Practices Act, N.Y.G.B.L § 349(h), and

common law theories of tortious interference with business relationships, unjust

enrichment, intentional infliction of emotional distress, and promissory estoppel.

KBSA and C.J. Lee (together, "the KBSA litigants") advance several counterclaims against plaintiffs and against now-counterclaim defendant Jung Hoon Lee ("J.H. Lee"), Hong's business partner, including breach of contract, libel, slander, copyright infringement, violations of the Lanham Act, 15 U.S.C. § 1125(a), false advertising in violation of N.Y.G.B.L. § 350, unfair competition under New York common law, use of name with intent to deceive in violation of N.Y.G.B.L. § 133, a N.Y.G.B.L. § 349(h) deceptive practices claim, tortious interference with business relationships, and three related civil conspiracy claims. All defendants now move for summary judgment against all of plaintiffs' claims. The KBSA litigants also move for summary judgment on their counterclaims for copyright violations, libel *per se*, and slander *per se*.

For the reasons set forth below, the Court grants defendants' motions for summary judgment dismissing all of plaintiffs' claims except three against Kong, Spring Video, and Kim for tortious interference with business relationships. Summary judgment is denied as to those three claims. The Court also denies the KBSA litigants' motion for summary judgment on their counterclaims for copyright infringement, libel *per se*, and slander *per se*, and, upon searching the record, grants summary judgment to the counterclaim defendants on the libel *per se* and slander *per se* claims.

## Background

The following facts are drawn from the pleadings and the parties' submissions, including statements of undisputed material facts submitted pursuant to Local Civil Rule 56.1.[1] The facts are construed, as they must be at summary judgment, in the light most favorable to the nonmoving party. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007). Any relevant factual disputes are noted.

Korean-American video stores in the New York metropolitan area purchase television programs, dramas, and movies that air in the Republic of Korea (i.e., South Korea) from various distributors, copy them with the distributors' permission, and rent them to their retail customers. (Compl. (Dkt. No. 1) ¶ 13). There are three distributors that supply Korean videos to stores in New York: Moon Hwa Broadcasting Company ("MBC"), Seoul Broadcasting Service ("SBS") and defendant KBSA. (*Id.* ¶ 14). KBSA is a wholly-owned subsidiary of KBS Korea Broadcasting System, a large public broadcaster in South Korea. (Pls.' Rule 56.1

---

[1]     In order to extricate and classify the facts relevant to its summary judgment inquiry, the Court applies the following principles: (1) any fact alleged in a moving party's Rule 56.1 statement, supported by the record, and not specifically and expressly contradicted by properly supported allegations in the nonmoving party's Rule 56.1 statement, is deemed admitted by the nonmoving party; (2) any fact alleged in a moving party's Rule 56.1 statement, supported by the record, which is specifically and expressly controverted by allegations in the nonmoving party's Rule 56.1 statement that are properly supported by the record, is not deemed admitted by the nonmoving party; (3) any fact alleged in a moving party's Rule 56.1 statement that is not supported by citations to admissible evidence in the record is not deemed admitted by the nonmoving party. *See Taylor v. Ridley*, 904 F. Supp. 2d 222, 229 (E.D.N.Y. 2012) (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)).

Statement ("Pls.' 56.1") (Dkt. No. 139) ¶ 1). KBSA's mission in the United States is twofold: to promote cultural ties between Korea and the United States by distributing Korean television programming to the broadest possible market; and, a market-driven one, to earn royalties on the distribution of copyright-protected KBS programs. (*Id.* ¶ 2).

KBS provides access to its programming in the U.S. primarily through weekly "master tapes" containing KBS content, which KBSA licenses and distributes, at a weekly fee, to individual video store owners for copying and retail distribution to their walk-in customers. (KBSA Litigants' Rule 56.1 Statement ("KBSA's 56.1") (Dkt. No. 126) ¶¶ 3-4). According to KBSA, these licenses are site-specific, and do not automatically transfer if a store owner decides to move his store to another location. (*Id.* ¶ 5). Although the licenses were, as of the relevant dates of this litigation, entirely oral, KBSA alleges that the terms were well known in the Korean video market. (*Id.* ¶ 13; (C.J. Lee Decl. (Dkt. No. 34), Exh. C)). Plaintiffs dispute the use of the term "license," arguing that it was not used by KBSA or the video store owners prior to this litigation, and deny that the licenses were store-specific, generally non-transferable, and authorized distribution to walk-in customers only. (Pls.' 56.1 ¶ 5).

In or around February 2004, Hong and J.H. Lee decided to open a Korean video store, and began researching the market by speaking to others in the industry. (Compl. ¶ 17; KBSA's 56.1 ¶¶ 14, 17). On October 5, 2004, the two partners had a

4

dinner meeting with Jong Seung Choi, a manager at MBC, and Hahn Gyoung Jo, a KBSA employee, at which the group discussed how Hong and J.H. Lee might go about opening a video store in Queens. (Pls.' 56.1 ¶ 5). Exactly what was said during this meeting is in dispute. According to Choi, Jo suggested that, rather than open a new store, Hong and J.H. Lee should buy an existing, inexpensive video store in Brooklyn ("the Shilla store"), and then move it to Queens. (Asher Decl. (Dkt. No. 137), Exh. A, at 51:10-56:18). Choi further claims that Jo told the two partners that KBSA would continue to provide the Queens store with tapes following the relocation. *Id.* However, Jo contradicts this account, claiming (1) that it was Choi, not him, who suggested that Hong and J.H. Lee buy an existing store and relocate; (2) that he does not recall having discussed the Shilla store with Hong and J.H. Lee; (3) that he never said "this [relocation] strategy would work with KBS America;" and (4) that he "did not in any way state, imply or indicate that KBS America would approve a license for [plaintiffs'] store at either location." (Jo Decl. (Dkt. No. 35) at ¶¶ 23-33).

In October 2004, Hong formed a corporation, Hwan Media Inc., in order to purchase the Shilla store. (KBSA's 56.1 ¶ 22). Hong was the sole owner of Hwan Media. (*Id.*). J.H. Lee entered into a verbal agreement with Hong that he would receive 50% of the profits from the store, but was never an employee, shareholder, or officer of Hwan Media, nor was he paid for the services he performed for the business. (*Id.* ¶ 23). The partners purchased the Shilla store in Brooklyn for around

5

$30,000 and assumed ownership of the store's existing KBSA license. (*Id.* ¶ 19; Jo Decl. at ¶ 35). According to KBSA, a store in Queens would have cost between $100,000 and $500,000. (KBSA's 56.1 ¶ 19). The rates store owners had to pay to the distributors for weekly master tapes were also higher in Queens than in Brooklyn. (*Id.* ¶ 20).

After a few weeks in Brooklyn, Hong and J.H. Lee closed the Shilla store and relocated their operations to a storefront in Fresh Meadows, Queens (now called "the Samsung store"). (*Id.* ¶ 26). J.H. Lee subsequently asked Jo, who had been delivering KBS master tapes to the Shilla store, to make future deliveries to the Queens location. (*Id.* ¶ 27). Jo made one tape delivery to a street corner in Queens and another two to the Samsung store. (*Id.*). Defendants attest that, each time Jo made a delivery to the Queens location, he informed the store owners that the tapes were for use in the Shilla store in Brooklyn, not for the Samsung store in Queens. (*Id.* ¶ 28). Hong and J.H. Lee distributed KBS content from these tapes at the Samsung store for three to four weeks, as well as KBS sports programming for which they did not have a license. (*Id.* ¶ 32; Asher Decl., Exh. J, 71:8-23; KBSA's 56.1 ¶ 33). During this time, defendants claim that the Samsung store owners continued to pay the lower Brooklyn rate for the master tape deliveries.[2] (KBSA's 56.1 ¶ 31).

---

[2]  The KBSA litigants' record citations indicate that Queens rates were generally higher than Brooklyn rates, and that plaintiffs had paid $200 per week at the Shilla store, but no one has offered record citations that clearly establish what rate plaintiffs paid after the move to Queens.

In December 2004, KBSA stopped providing the Samsung store with KBS master tapes. The circumstances surrounding this supply cut-off, and the reasons for it, are in dispute. C.J. Lee, General Manager of KBSA's Eastern regional office, claims that, sometime during the week of November 29, 2004, he learned that the partners had moved their store from Brooklyn to Queens, which led him to "investigate whether KBS programs were being illegally rented" from the Queens location. (C.J. Lee Decl. ¶¶ 69-70.) C.J. Lee states that he visited the Samsung store on December 3, 2004, enabling him to confirm firsthand that plaintiffs were distributing KBS content. (*Id.* ¶¶ 71-74; KBSA's 56.1 ¶ 35). Soon thereafter, KBSA terminated the supply of KBS master tapes to plaintiffs. (KBSA's 56.1 ¶ 35)

Defendants contend that KBS cut off Hong and J.H. Lee's supply of videos because the partners had violated the terms of the Shilla store license by neglecting to inform KBSA management about the move to Queens and failing to request a new license for the Samsung store. (*Id.*). Because of this, defendants claim, KBSA was unable to investigate the viability of the new store's location and its potential impact on KBSA's distribution stream. (*Id.*). C.J. Lee states that he subsequently told Hong and J.H. Lee that they would have to apply for a license through the "normal approval process," which involved review by KBSA's Los Angeles office. (*Id.* ¶ 36).

Plaintiffs vehemently dispute defendants' account of these events. (Pls.' 56.1

¶ 35(b)). They contend that Hong and J.H. Lee did, in fact, inform KBSA management of the move during their October 5, 2004 dinner meeting with Jo and Choi, at which Jo allegedly "encouraged, authorized and approved" the purchase of the Shilla store and its subsequent relocation to Queens. (*Id.* ¶ 35(a)). They further assert that it was never agreed that the license to copy and distribute KBS programming was site-specific and would not automatically transfer from the Shilla store to the Samsung store. (*Id.* ¶ 13). As discussed above, Choi—a non-party witness—largely corroborated plaintiffs' version of the dinner meeting, while Jo and C.J. Lee deny that any such authorization and approval was granted.

Plaintiffs further claim that KBSA's termination of supply had nothing to do with either the relocation of the store or the license issue. Instead, they point to evidence of anticompetitive behavior on the part of other video store owners in conjunction with KBSA. Kim, owner of Han Kook Video, was at the time the president of the New York Korean Video Store Owners Association (the "Association"), whose members own and operate Korean video stores in the New York area. (*Id.* ¶ 35(b)). Kong, owner of Spring Video, was the vice-president of the Association at the time. Plaintiffs claim that Kim, Kong, and other Association members entered into an agreement to charge a uniform $1.50 price for video rentals, and pressured KBSA to cut off supply to plaintiffs' store because it was charging only $1.00 per rental.

As evidence of this alleged price-fixing scheme, plaintiffs cite the following:

- Choi's deposition testimony that he heard that Kim visited all the other Korean video store owners and got them to agree on a $1.50 rental price. (Pls.' 56.1 ¶ 35(b); Asher Decl., Exh. A, at 101:3-25).

- Hong's deposition testimony that Kim told him he had been suggesting to all the video stores that they should charge $1.50, which had been widely accepted. (Geercken Decl. (Dkt. 127), Exh. H at 101:16-102:24)).

- A February 25, 2005 telephone conversation between Kim and Hong regarding the apparent hostility from other store owners regarding the pricing practices and location of the Samsung store. Plaintiffs and defendants have offered competing transcriptions of this conversation. (*See* Pls.' 56.1 ¶ 35(b); Asher Decl., Exh. B ("Hong Decl.), Exh. 1 (plaintiffs' transcription); C.J. Lee Decl., Exh. E (defendants' transcription)).

- A recorded February 25, 2005 conversation (the "bakery conversation") between Hong, J.H. Lee, and C.J. Lee at which, plaintiffs claim, C.J. Lee admitted that KBSA terminated the Samsung store's supply of videos because the two partners would not abide by the terms of the price-fixing agreement. (Hong. Decl. ¶ 27). Defendants claim that the recording of this conversation is garbled and unintelligible, (*see* KBSA's 56.1 ¶¶ 39-40). The Court ordered that a transcription be made of an audio-enhanced version of the recording, and both parties have again offered their own competing transcriptions. (*See* Pls.' 56.1 ¶ 35(b); Asher Decl. Exh. C (court-ordered transcription), Exh. E (plaintiffs' transcription), Exh. D (defendants' transcription)). All three transcriptions are, indeed, extremely difficult to decipher.

- Statements Kong and Kim allegedly made in May 2004 to members of the Korean-American media regarding their intention to enforce the price-fixing arrangement and shut out non-cooperators, as well as articles in the Korea Central Daily News and Korea Times reporting the alleged statements. (Pls.' 56.1 ¶ 35(b); Compl., Exh. A).

- An affidavit from a customer stating that she started renting from the Samsung store because its rental price was $1, as

opposed to the $1.50 charged by other stores in the area. (Pls.' 56.1 ¶ 35(b); Asher Decl., Exh. K).

- A "suspicious flurry of phone calls" between Kong and Han, another KBSA employee, around the time the Samsung store's video supply was terminated, including seven calls on the day C.J. Lee and Han visited the store. (Pls.' 56.1 ¶ 35(b); Asher Decl., Exh. O).

- A complaint submitted to the Federal Trade Commission by Assa Video, another Korean video store, accusing KBSA of operating an unlawful monopoly in the Korean video rental market along with video stores and other distributors. (Pls.' 56.1 ¶ 35(b); Asher Decl., Exh. L).

- A petition circulated by the National Association of Video Owners urging KBSA to remedy the problems of overpricing and oversaturation. (Pls.' 56.1 ¶ 35(b)).

On or around December 8, 2004, Hong and J.H. Lee contacted and spoke with with reporters from the Korean-American media, alleging that KBSA had wrongfully terminated the supply of videos to the Samsung store. (KBSA's 56.1 ¶¶ 64, 37; Geercken Deck., Exh. M, 266:18-275:2). That same month, Hong also delivered a bottle of whiskey to C.J. Lee at KBSA's Eastern regional office, apparently in hopes of receiving a favorable resolution to the conflict. (C.J. Lee Decl. ¶¶ 118, 121; Pls.' 56.1 ¶¶ 66-67). C.J. Lee considered this an act of bribery, which he claims to "abhor," and returned the bottle unopened. (C.J. Lee Decl. ¶¶ 120-21; KBSA's 56.1 ¶ 67).

On or around February 2, 2005, Hong and J.H. Lee sent a letter to KBSA's CEO, Kevin Kwon, imploring him to resume the Samsung store's supply of KBS master tapes. (KBSA's 56.1 ¶¶ 37, 65; Kwon Aff.. (Dkt. No. 36), Exh. 1)). The letter

10

also indicated that C.J. Lee had terminated the supply in response to threats he believed the Samsung store owners had made to KBSA, and suggested that "a third person"—implicitly, other store owners—had spread lies about Hong and J.H. Lee in order to damage their relationship with KBSA. (Kwon A., Exh. 1). Also in February 2005, Hong filed two complaints via the Internet with South Korea's Citizen's Complaint Resolution Committee, an agency within the Blue House (the Korean equivalent of the White House). (KBSA's 56.1 ¶ 66; C.J. Lee Decl. ¶¶ 117-124., Exhs. M-N). These complaints charged KBSA of wrongfully terminating the Samsung store's video supply and accused C.J. Lee of soliciting and accepting bribes from store owners, and of threatening to "make things very difficult" for Hong. (KBSA's 56.1 ¶ 66; C.J. Lee Decl. ¶¶ 117-124, Exhs. M-N).

On March 2, 2005, Hong and Hwan Media filed this lawsuit against defendants under the Sherman Act and a host of state law causes of action. (*See* Compl.) In response, the KBSA litigants asserted a raft of counterclaims. (*See* Am. Ans. (Dkt. No. 56)). Now before the Court are defendants' motions for summary judgment against all of plaintiffs' claims, as well as the KBSA litigants' motion for summary judgment on its counterclaims for copyright infringement, libel *per se*, and slander *per se*.

## Standard of Review

A motion for summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly and Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In deciding a motion for summary judgment, the court cannot *try* issues of fact but can only determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (internal quotations omitted) (emphasis in original). The burden rests with the moving party to demonstrate that there is no genuine issue as to any material fact. *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "[A] court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 207) (internal quotations and citations omitted).

If the moving party meets its initial burden of demonstrating no dispute of material fact, the burden then shifts to the nonmoving party. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). However, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Celotex*, 477 U.S. at 324. Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 447 U.S. at

12

247-48 (emphasis in original). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

Finally, the Second Circuit has instructed that, "[i]n the context antitrust cases . . . summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." *PepsiCo*, 315 F.3d at 104. Therefore, "[a]lthough all reasonable inferences will be drawn in favor of the non-movant, those inferences 'must be reasonable in light of competing inferences of acceptable conduct.'" *Id.* at 105 (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir.1998)).

## Discussion

I. Plaintiffs' Claims

### a. The Sherman Act

To succeed on a Sherman Act claim, a plaintiff must not only satisfy the substantive elements of the statute, but must also establish antitrust standing, which is distinct from standing under Article III of the Constitution. *See Shaywitz v. Am. Bd. of Psychiatry and Neurology*, 675 F. Supp. 2d 376, 385 (S.D.N.Y. 2009) (citing *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 535 n. 31 (1983)). The Supreme Court has described several factors relevant to antitrust standing: whether the alleged injury "'is of the type that the

antitrust statute was intended to forestall,' 'the directness or indirectness of [that] injury,' the extent to which the plaintiff's asserted damages are speculative, 'the potential for duplicative recovery or complex apportionment of damages,' and 'the existence of more direct victims of the alleged conspiracy.'" *Gatt Commc'ns, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68 (2d Cir. 2013) (quoting *Associated Gen. Contractors*, 459 U.S. at 540-45). The Second Circuit has "distilled these factors into two imperatives." *Gatt Commc'ns*, 711 F.3d at 76. First, an antitrust plaintiff must plausibly allege "that it suffered a special kind of antitrust injury." *Id.* at 76 (internal quotations omitted). Second, the grievant must show that "it is a suitable plaintiff to pursue the alleged antitrust violations and, thus, is an 'efficient enforcer' of the antitrust laws." *Id.* (internal quotations omitted).

To that end, case law has embraced a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury:

> First, the [plaintiff] . . . must identify the practice complained of and the reasons such a practice is or might be anticompetitive. Next, [the court must] identify the actual injury the plaintiff alleges. This requires [the court] to look to the ways in which the plaintiff claims it is in a "worse position" as a consequence of the defendant's conduct. Finally, the court must compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.

*Id.* (internal citations and quotations omitted). Significantly, "[i]t is not enough for the actual injury to be 'causally linked' to the asserted violation." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 487 (1977)). "Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is

'of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful.'" *Gatt Commc'ns*, 711 F.3d at 76 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)). Put differently, "[p]laintiffs must allege harm to the general market that has, in turn, harmed their own interests." *E & L Consulting, Ltd. v. Doman Indus., Ltd.*, 360 F. Supp. 2d 465, 474 (E.D.N.Y. 2005).

Not surprisingly, the parties in this case spar over whether plaintiffs have established antitrust standing. Plaintiffs' chief contention is that KBSA cut off their supply of KBS videos in retaliation for their failure to adhere to the alleged price-fixing agreement, and to prevent the Samsung store from freely competing with other Korean video stores. (Pls.' Mem. (Dkt. No. 138) at 12). "As a result," plaintiffs assert, "[the Samsung] store had significant losses that it would otherwise have not suffered had KBS[A] continued its supply of content." (*Id.*) "The type of injury Plaintiffs suffered," they continue, "was therefore distinctly an *antitrust* type of injury and resulted *directly* from the defendant store owners' desire to limit competition and maintain a price floor and from defendant KBS[A]'s complicity in maintaining the store owners' price floor." (*Id.* (emphasis in original)). They further contend that defendants' actions were "intended not only to injure [plaintiffs], but also video customers, who would as a result need to pay artificially higher prices for their videos. Once supply of KBS content to Plaintiffs' store was terminated, customers had to travel to Flushing." (*Id.* at 13).

The KBSA litigants counter that "any injury to Plaintiffs' business once KBSA terminated supply (inasmuch as Plaintiffs continued to rent videos from other, allegedly less popular suppliers) would be purely private in nature and, therefore, insufficient to give rise to antitrust standing." (KBSA's Mem. (Dkt. No. 128) at 10). Citing *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62 (E.D.N.Y. 2006), the KBSA litigants argue that a distributor does not achieve antitrust standing merely because it suffers a loss in profits, or goes out of business, after a supplier cuts off its supply of a popular product, even if the supplier's actions unreasonably hamper competition and result in uniformally higher prices. (KBSA's Mem. at 11). Furthermore, the KBSA litigants contend that the market for Korean video rentals does not, in fact, reveal uniform pricing, and that no anticompetitive effects have resulted from any of their actions. (*Id.*).

The controlling precedent, however, is not *Union Cosmetic,* but is, instead, *Gatt Communications*, in which the Second Circuit considered and rejected a plaintiff's claim of antitrust standing on essentially identical facts. *See* 711 F.3d at 76-80. In its light, plaintiffs' argument for antitrust standing must fail. Because the facts in *Gatt Communications* are so analogous to the case at bar, they are worth recalling here. In that case, Gatt (a retailer of commercial radios) and Vertex (a radio manufacturer/distributor) entered into a contract, pursuant to which Gatt became a licensed dealer of Vertex radios and equipment. *Id.* at 71-72. According to the agreement, Gatt's dealings with Vertex would be coordinated through PMC,

also a dealer /retailer of Gatt radios and Gatt's sales representative in New York. *Id.* at 72. Vertex instructed Gatt that failure to cooperate with PMC could result in termination of the contract. *Id.*

Between 2002 and 2007, various governmental agencies in New York purchased Vertex radios by soliciting bids from dealers. *Id.* at 72. Unbeknownst to these agencies, the dealers (at PMC's direction, and with Vertex's support and encouragement) operated a bid-rigging scheme between 2005 and 2007, whereby one dealer would submit a "real" bid for a particular solicitation (never to fall below a specified price floor) and other dealers would submit inflated phony bids, resulting in a loss of opportunity to win the bid for any but the "real" bidder. *Id.* Each dealer would then get a turn as the "real" bidder on subsequent solicitations, creating artificially higher prices paid by the agencies for Vertex radios. *Id.*

After a year and a half of participating in the bid-rigging scheme, Gatt decided to break ranks with the cartel, and submitted its own rogue bid for a contract with the New York City Transit Authority ("NYCTA") in excess of $1 million. *Id.* at 73. NYCTA indicated that Gatt would likely win the contract, and PMC complained to Vertex, which promptly terminated its contract with Gatt. *Id.* NYCTA then re-bid the solicitation after discovering technical errors in the original solicitation, and Gatt, now unable to sell Vertex products, was unable to participate in the bidding. *Id.* at 74.

Gatt subsequently sued PMC under the Sherman Act, seeking to recover lost profits from the NYCTA contract and subsequent bid solicitations from which it was now shut out. *Id.* Affirming the district court's dismissal for lack of antitrust standing, the Second Circuit observed that, while "the illegal 'practice' Gatt alleges is the carrying out of an illegal bid-rigging scheme, and Gatt's alleged injury is the harm it suffered as a consequence of its inability to continue selling Vertex products ... [t]his harm only supports antitrust injury ... if it flows from that which makes the bid-rigging scheme unlawful." *Id.* at 77. Considering this question, the court reasoned that,

> even assuming that the alleged bid-rigging scheme is unlawful, it is so only because of the harm it may cause—increased prices—to purchasers of Vertex products. *See Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir.1994). Gatt's lost revenue resulting from the Vertex termination, however, is not an injury that flows from that which makes bid-rigging unlawful. Gatt has not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might. ... Even if the antitrust laws seek to prevent Vertex and PMC's alleged activities because of resulting harms to *competition*, these laws are not concerned with injuries to *competitors* such as Gatt resulting from their participation in or exile from such schemes. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990).

*Gatt Commc'ns*, 711 F.3d at 77 (emphasis in original). In line with its analysis, the court held that "Gatt's allegations fail to demonstrate injury 'of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful [under the antitrust laws].' *Brunswick*, 429 U.S. at 489. Therefore, Gatt does not have antitrust standing to pursue these claims." *Gatt Commc'ns*, 711 F.3d at 77.

The alleged wrongful conduct now before the Court is functionally indistinguishable from that presented in *Gatt Communications*.[3] Here, the only injury that plaintiffs claim to have suffered as a result of defendants' allegedly unlawful activities is lost revenue due to the termination of plaintiffs' access to their KBS video supply. But, as *Gatt Communications* makes crystal clear, a competitor's lost profits is not an injury "of the type the antitrust laws were intended to prevent." 711 F.3d at 77. Rather, horizontal price-fixing schemes are illegal under the antitrust laws "only because of the harm [they] may cause—increased prices—to *purchasers*" of the product for which prices have been fixed. *Id.* (emphasis added). Plaintiffs never paid higher prices for KBS videos as a result of the alleged price-fixing arrangement. They claim, instead, and more grievously to them, that their supply of KBS videos was simply cut off when they refused to participate, just as Gatt's supply of Vertex radios was terminated after it abandoned the bid-rigging scheme that fixed prices there.

Plaintiffs, of course, try to divert attention to their rental customers. In their brief, they refer to the "artificially higher prices" that the price-fixing scheme would create for customers, and also point out that "[o]nce supply of KBS content to Plaintiffs' store was terminated, customers had to travel to Flushing" to rent their videos. (Pls.' Mem. at 13). Certainly, these are the kinds of injuries that the

---

[3]    It should be noted that, unlike in *Gatt Communications*, there is no claim that plaintiffs in this case ever participated in the alleged price-fixing scheme that they now attack under the Sherman Act. However, that fact did not affect the *Gatt Communications* court's reasoning on the issue of antitrust standing. *See generally Gatt Commc'ns*, 11 F.3d at 77-80.

Sherman Act was intended to prevent, and if video customers brought suit on those facts, they might well achieve antitrust standing. It is unmistakable from the record, though, that if such injuries were inflicted, they were not suffered by plaintiffs themselves; their injury was profit, not price. In *Gatt Communications*, the court held that lost profits, though an economic injury, is simply not the type of injury that confers antitrust standing on a claimant. That is the case here.

Plaintiffs fare no better with regard to their Sherman Act § 2 claim. In the complaint, they advance this claim against all defendants, but only brief KBSA's alleged monopoly power. (*See* Pls.' Br. at 17-21). Even if KBSA did, in fact, operate such a monopoly, *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995) forecloses any possibility that plaintiffs might have antitrust standing to bring a § 2 claim. In *G.K.A. Beverage*, a group of truck drivers/distributors of soda products sued a soda bottling company for allegedly monopolizing the local bottling market (that is, the market one level up in the distribution chain from the drivers). *Id.* at 764-66. The drivers claimed to have suffered losses after the bottler allegedly used its monopoly power to drive a competing bottler, with whom the drivers had a contract, into bankruptcy. *Id.* at 766. The court held that the drivers' injuries were merely derivative, and that "a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing." *Id.*; *see also A.G.S. Electronics, Ltd. v. B.S.R. (U.S.A.), Ltd.*, 460 F. Supp. 707, 710-11 (S.D.N.Y.), *aff'd*, 591 F.2d 1329 (2d Cir.

1978) (plaintiff distributor lacked antitrust standing where its sole injury was lost profits due to defendant manufacturer's acquisition of a competitor and termination of plaintiff's exclusive distribution contract with that entity).

In this case, plaintiffs baldly assert (without any supporting evidence) that KBSA controls 60% of the market for broadcasters and/or suppliers of Korean videos. (Pls.' 56.1 ¶ 35). Even if true, this fact would not, without more, prove that KBSA had monopoly power over its competitors. *See, e.g., PepsiCo*, 315 F.3d at 109 (64% of market share insufficient to show monopoly power). But, even accepting, for argument's sake, plaintiffs' claim that KBSA possesses monopoly power over the market for Korean videos, they would still lack antitrust standing. *G.K.A. Beverage* leaves no doubt that a product distributor may not sue a supplier under § 2 of the Sherman act when its injuries are merely derivative of the supplier's monopoly power against its competitors. Plaintiffs never competed with KBSA; rather, they were one of its customers. Therefore, the injury they suffered as a result of KBSA's alleged monopoly—termination of their video supply— was, at best, derivative. There can be no antitrust standing based on this injury.

Despite the intimations in the complaint, plaintiffs do not marshal any record evidence showing, nor do they even allege in their brief, a monopoly of the video rental market held by the non-KBSA litigants. As such, the Court must consider any such claims as abandoned. *See, e.g., Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (claims raised in complaint but nowhere else in the record

21

were deemed "abandoned" at the summary judgment stage). But even if plaintiffs had not abandoned these claims, they would still lack antitrust standing to pursue them. Once again, the only injury plaintiffs have suffered is loss of profits due to KBSA's termination of their KBS video supply. Assuming as true plaintiffs' claim that KBSA had cut off this supply in retaliation for their refusal to join the video stores' alleged monopolistic cartel, this injury is, at best, a derivative one.[4] *G.K.A. Beverage* makes clear that an injury of this nature cannot support antitrust standing. In short, plaintiffs have not suffered the kind of injury needed to support antitrust standing. Consequently, they cannot pursue their causes of action under the Sherman Act, and defendants are granted summary judgment on all such claims.

### b. The Donnelly Act

The Donnelly Act claims stumble on the same ground: antitrust standing. The Donnelly Act prohibits "[e]very contract, agreement, arrangement or combination whereby . . . [a] monopoly . . . is or may be established or maintained, or whereby . . . competition . . . is or may be restrained." N.Y.G.B.L § 340(1). The New York Court of Appeals has held that "the Donnelly Act, having been modelled on the

---

[4]   Notably, plaintiffs offer neither pleadings nor proof that KBSA played any direct role in fixing the retail price for Korean videos, either alone or in conjunction with the Association, or that it played even an indirect role apart from allegedly terminating the Samsung store's video supply. Even if plaintiffs had antitrust standing, their factual allegations against KBSA fall far short of the mark to support a Sherman Act claim.

Federal Sherman Act . . . should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518, 611 N.Y.S.2d 786, 634 N.E.2d 158 (1994) (internal quotations omitted). Plaintiffs have offered no reasons for interpreting their Donnelly Act claims differently from their Sherman Act claims, and the Court detects none independently. Indeed, the courts in both *Gatt Communications*, 711 F.3d at 81-82, and *G.K.A. Beverage*, 55 F.3d at 766-67, dismissed plaintiffs' parallel Donnelly Act charges along with their Sherman Act claims for lack of antitrust standing. The Court now follows suit. Summary judgment for defendants on all Donnelly Act claims is granted.

### c. Deceptive Practices Act

New York's Deceptive Practices Act ("DPA"), N.Y.G.B.L. § 349(h), prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." In this lawsuit, plaintiffs allege that they "had a reasonable expectation that the price of [Korean rental] videos and their distribution would not already be established and controlled by Defendants and their fellow co-conspirators," but that "that expectation was thwarted by Defendants' activities"—presumably, since the motion papers are otherwise silent, the alleged price-fixing scheme— "and by their concealment of those activities." (Compl. ¶ 85). Furthermore, plaintiffs allege that, "[b]y fixing the price at which Korean videos were sold, and by monopolizing the

Korean video market, Defendants wrongfully deprived Plaintiffs of the opportunity to compete in a free and open marketplace." (*Id.* ¶ 86).

To prevail on a DPA claim, a plaintiff must show that the defendant has engaged in "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 911 N.E.2d 834, 883 N.Y.S.2d 772 (2009). To qualify as "consumer-oriented conduct," a defendant's acts or practices "need not be repetitive or recurring," but "must have a broad impact on consumers at large; private contract disputes unique to the parties . . . would not fall within the ambit of the statute." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 320, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995) (internal quotations omitted). "Materially misleading conduct" is that which is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995).

Notably, "[a]lthough the [DPA] is based upon section 5 of the Federal Trade Commission Act . . . , New York has chosen not to include 'unfair competition' or 'unfair' practices in its consumer protection statute, language that bespeaks a significantly broader reach." *In re Digital Music Antitrust Litigation*, 812 F. Supp. 2d 390, 410 (S.D.N.Y. 2011) (internal quotations omitted). "Accordingly, 'anticompetitive conduct that is not premised on consumer deception is not within

the ambit of the statute,' *Leider v. Ralfe*, 387 F. Supp. 2d 283, 295 (S.D.N.Y.2005), because '[t]he statute seeks to secure an honest market place where trust, and not deception, prevails.'" *Music Antitrust Litigation*, 812 F. Supp. 2d at 410 (quoting *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324, 774 N.E.2d 1190, 1195, 746 N.Y.S.2d 858, 863 (2002)); *see also In re New Motor Vehicles Canadian Export Antitrust Litigation*, 350 F. Supp. 2d 160, 197 (D. Me. 2004) ("An antitrust violation *may* violate section 349, but *only* if it is deceptive.") (emphasis added).

In this case, plaintiffs have failed to adduce evidence that the allegedly unlawful conduct—the price-fixing scheme—was in any way materially misleading to consumers. While horizontal price floors may be illegal under antitrust laws due to their anticompetitive effects, arrangements of this nature do not necessarily mislead customers, or dupe them into making purchases they otherwise would not have made. These schemes may result in artificially inflated costs, but without additional evidence of materially misleading conduct, they cannot in and of themselves undergird a successful DPA claim. Mere failure by the scheme's participants to disclose the nature of the arrangement is not enough—direct evidence of misleading or deceitful activity is required. *See, e.g., In re Digital Music Antitrust Litigation*, 812 F. Supp. 2d 390, 409 (S.D.N.Y. 2011) ("[I]f failure to disclose participation in a purported antitrust conspiracy were sufficient to state a consumer-protection claim, then *any* [Sherman Act] Section 1 antitrust case would automatically become a consumer-protection case. That is not the law.") (emphasis

25

in original). *See also id.* at 410 (dismissing DPA claim based on price-fixing scheme in the absence of facts indicating deceptiveness); *Leider v. Ralfe*, 387 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) (rejecting DPA claim because defendants' monopolistic practices, "while certainly reprehensible, [were] not secretive").

Despite their conclusory assertions regarding the "deceptive" nature of defendants' conduct, (*see* Compl. ¶ 85), plaintiffs point to no record evidence suggesting that defendants ever took steps to ensure that customers were unaware of the alleged price-fixing scheme, or engaged in any other deceptive activity. On the contrary, plaintiffs themselves claim that Kong and Kim publicly announced, in a May 2004 press conference (at least five months before plaintiffs purchased the Shilla store), the intention of Association-affiliated stores to tamp down on increased price competition and ensure that uncooperative stores would be unable to operate. (Pls.' 56.1 ¶ 7). Plaintiffs include as exhibits to the complaint articles from two Korean language newspapers describing the press conference and reporting the key quotes from Kim and Kong. (Compl., Exhs. A and B).[5] They cannot now credibly assert that there is a triable issue of fact as to whether defendants were deceitful in operating the alleged price-fixing scheme.

---

[5] The Court emphasizes that it refers to these articles not as evidence of the truth of the statements they report, but as evidence of the fact that the alleged price-fixing scheme was public knowledge. Therefore, they do not constitute hearsay. *See Anderson v. United States*, 417 U.S. 211, 220 (1974) ("Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted."). In any event, plaintiffs have offered these statements into evidence, and cannot now object to their admissibility. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005).

Simply put, the defendants' alleged scheme may have been, in the words of *Leider*, "reprehensible," but it was not "secretive." Plaintiffs therefore cannot survive summary judgment on their DPA claim. It is of no import that "the practice of which Plaintiffs complain is not merely the charging of high prices but rather inducing Plaintiff Hong to open and relocate a video store with the expectation that he could freely set the rental price of his videos, conspiring to charge a high price, using market power to enforce the conspiracy, and terminating supply that Defendants had promised." (Pls.' Mem. at 22). The fact remains that all of these allegations are part and parcel of the general claim that defendants operated an illegal price-fixing cartel and retaliated against plaintiffs for their refusal to participate. As explained above, plaintiffs have not provided any facts indicating that this scheme was one that might materially mislead reasonable consumers. Accordingly, plaintiffs' DPA claim fails, and summary judgment is awarded to defendants.[6]

### d. Tortious Interference Claims

Next, plaintiffs advance a claim against all defendants for "tortious interference with customer base," (Compl. ¶¶ 106-111), a cause of action that does not exist under New York law. Plaintiffs reformulate this claim in their brief as one for tortious interference with an existing contract and prospective business relations—two separate causes of action—and the parties both brief the issue

---

[6] Having rejected plaintiffs' claims under the Sherman Act, Donnelly Act, and the DPA, the Court also dismisses plaintiffs' eighth and ninth claims, which request declaratory and injunctive relief under those statutes. (Compl. ¶¶ 68-83).

accordingly. (Pls.' Mem. at 23-26; KBSA Mem. at 29-31; KBSA's Reply (Dkt. No. 141) at 15-16). The Court, therefore, construes plaintiffs' fourteenth claim as two distinct claims: one for tortious interference with an existing contract, and one for tortious interference with prospective business relations.

Under New York law, "[t]o succeed on a cause of action alleging tortious interference with an existing contract, the plaintiff must establish: (1) the existence of a valid contract between it and a third party, (2) the defendants' knowledge of that contract, (3) the defendants' intentional procurement of the third party's breach of that contract without justification, and (4) damages." *Barns & Farms Realty, LLC v. Novelli*, 82 A.D.3d 689, 690, 917 N.Y.S.2d 691, 693 (2d Dep't 2011) (internal quotations omitted). With regard to the first element, the contract at issue must be specific, as "conclusory allegations of interference with an unspecified contract are insufficient." *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 227 (S.D.N.Y. 2013). As to the second element, "although a defendant need not be aware of all the details of a contract, it must have actual knowledge of the specific contract" that is the subject of the claim. *Medtech Products Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 796 (S.D.N.Y. 2008) (internal quotations omitted). Finally, a plaintiff cannot prevail on a claim of this nature unless he demonstrates an actual breach of the specified contract. *See NBT Bancorp Inc. v. Fleet/Norstar Financial Group*, Inc., 87 N.Y.2d 614, 620-21, 664 N.E.2d 492, 496, 641 N.Y.S.2d 581, 584 (1996) ("Indeed, breach of

contract has repeatedly been listed among the elements of a claim for tortious interference with contractual relations.").

To support their claims that defendants interfered with existing contracts, plaintiffs point to "three affidavits of existing customers of Plaintiffs who have all claimed under oath that in the event the Defendants ceased supply of KBS content, they would have no choice but go to another store that supplies KBS content." (Pls.' Mem. at 24; Asher Decl., Exh. K (Affidavits of So Mi Yoon, Yun Sook Park, and Han Suh Hahn)). But, at no point do any of the affiants indicate that they had a contract of any kind—written or oral, express or implied—to rent videos from the Samsung store: they merely attest that they rent or have rented KBS videos from Samsung, but will have to begin renting them from a different store if Samsung's KBS supply is terminated. (Asher Decl., Exh. K at PDF pp. 2, 4-5). There is no evidence whatsoever of a binding contractual relationship between any of these customers and plaintiffs. Pointedly, the evidence points in exactly the opposite direction—to traditional, *ad hoc* retail transactions. The claim of tortious interference with an existing contract, as a result, fails on that ground alone.

Even if such contractual relationships *did* exist, there is, moreover, no evidence of a breach: the affiants merely state that they "*may*" or "*will* have to return to [their] prior rental place[s]" if Samsung remains unable to obtain KBS videos. (*Id.*). Mere anticipation of breach, however, will not suffice: a plaintiff must show an *actual* breach to prevail. *See, e.g., Am. Bldg. Maintenance Co. of N.Y. v.*

*Acme Property Servs., Inc.*, 515 F. Supp. 2d 298, 315 (N.D.N.Y. 2007) (rejecting claim of tortious interference with contractual relations because plaintiffs "failed to allege actual breach" by the third party). Similarly, even if there were actual contracts between plaintiffs and the three named customers, there is no record evidence whatsoever that any of the defendants had actual knowledge of these contracts. For these additional reasons, summary judgment must be awarded to defendants.

The claim of tortious interference with prospective business relations meets the same fate. A claim of this nature requires proof of "(1) the defendant's knowledge of a business relationship between the plaintiff and a third party; (2) the defendant's intentional interference with the relationship; (3) that the defendant acted by the use of wrongful means or with the sole purpose of malice; and (4) resulting injury to the business relationship." *534 East 11th Street Housing Dev. Fund Corp. v. Hendrick*, 90 A.D.3d 541, 542, 935 N.Y.S.2d 23, 24 (1st Dep't 2011). "[I]t is not necessary that the prospective relation be expected to be reduced to a formal, binding contract." *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) (citing Restatement (Second) of Torts § 766B cmt. c.). "Accordingly, the tort encompasses . . . interferences with . . . the opportunity of selling or buying . . . chattels or services, and any other relations leading to potentially profitable contracts." *Hannex*, 140 F.3d at 205 (internal quotations omitted).

Once again, plaintiffs falter because they have offered no evidence indicating that any of the defendants had actual awareness of plaintiffs' business relationships

with affiants Yoon, Park, and Hahn, or that they intentionally sought to interfere with those relationships. Plaintiffs assert that "Defendants knew or should have known the Plaintiffs had customers who enjoyed KBS content and employed wrongful means to interfere with that relationship." (Pls.' Mem. at 25). A generalized allegation of this nature will not pass muster; plaintiffs must show that defendants had *actual knowledge* of the *specific* business relationships with which they allegedly interfered. Courts have repeatedly rejected general claims of this nature because the party claiming interference could not make such a showing. *See, e.g., Boehner v. Heise*, 734 F. Supp. 2d 389, 406-07 (S.D.N.Y. 2010) (granting summary judgment to defendant, a ginseng trade organization, in part because plaintiff, a ginseng wholesaler, could not show that the defendant knew that a particular supplier had sold ginseng to plaintiff in the past or intended to do so in the future); *Sedona Corp. v. Ladenburg Thalmann & Co.*, Inc., No. 03-Civ. 3120, 2009 WL 1492196, at *9 (S.D.N.Y. May 27, 2009) (dismissing claim because, while plaintiff "refers to Defendants' knowledge of [plaintiff's] business model *generally*, at no point does [it] actually allege that Defendants knew about the *specific* business relationships [at issue]") (emphasis added); *800America, Inc. v. Control Commerce, Inc.*, 202 F. Supp. 2d 288, 289-90 (S.D.N.Y. 2002) (holding similarly). Because the record is bereft of evidence indicating that defendants had knowledge of plaintiffs' business relationships with Yoon, Park, or Hahn (or, indeed, with any other specific

31

customer), the Court grants summary judgment to defendants on plaintiffs' claim for tortious interference with prospective business relations.

Relatedly, plaintiffs also advance three tortious interference claims against Kong, Spring Video, and Kim on the grounds that these defendants intentionally interfered with plaintiffs' contractual, economic, and prospective business relationship with KBSA. (Compl. ¶¶ 88-105). Although these defendants move to dismiss "any and all claims asserted against [them]" in their motions, (*see* Def. Kong and Spring Video's Mem. (Dkt. No. 135) at 4; Def. Kim's Mem. (Dkt. No. 132) at 4), neither defendants nor plaintiffs analyze or even mention these particular claims in their briefs. Accordingly, the Court denies defendants' motion for summary judgment at this time on these causes of action. *Gavigan v. Comm'r. of I.R.S.*, No. 3:06–CV–942, 2007 WL 1238651, at *7 (D. Conn. Apr. 27, 2007) (denying defendant's motion to dismiss a specific claim because it "did not brief the issue and makes only passing references to dismissing all of Plaintiffs' claims under Rule 12(b)(6)"); *Goshorn v. Bonamie*, No. 95–CV–188, 1998 WL 166832, at *8 (N.D.N.Y. Apr. 08, 1998). At the same time, given the parallel tortious interference claims that are dismissed by this Order, leave is granted to Kong, Spring Video, and Kim to file a supplemental summary judgment motion on those claims.

### e. Unjust Enrichment

As part of their state law assaults, plaintiffs bring a cause of action against all defendants for unjust enrichment. (*See* Compl. ¶¶ 112-15). It is, though, derivative

of their antitrust claims. Plaintiffs concede that a litigant "cannot recover for unjust enrichment if the underlying basis for the claim is a failed antitrust claim pursuant to the holding set forth in *Kramer v. Pollock-Krasner*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995)." (Pls.' Mem. at 26); *see also Sands v. Ticketmaster-New York, Inc.*, 207 A.D.2d 687, 688, 616 N.Y.S.2d 362, 364 (1st Dep't 1994). Plaintiffs, however, go on to assert that their antitrust claims "are cognizable and certainly not barred as a matter of law," and, therefore, "the claim for unjust enrichment should be sustained." (Pls.' Mem. at 26).

As discussed above, plaintiffs lack antitrust standing to pursue their Sherman Act and Donnelly Act claims. However, in both *Kramer* and *Sands*, the courts rejected plaintiffs' antitrust claims on the merits, rather than disposing of them on the threshold issue of antitrust standing, as the Court has done here. *See Kramer*, 890 F. Supp. at 254-57; *Sands*, 207 A.D.2d at 688. These holdings could plausibly be interpreted to extend only to cases in which the court fully considers the underlying antitrust claims on the merits. However, courts have held that indirect purchasers— who, under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), lack antitrust standing to bring claims under the Sherman Act and other federal antitrust statutes—may not circumvent the Court's holding in *Illinois Brick* by characterizing their causes of action as unjust enrichment claims. *See, e.g., In re Digital Music Antitrust Litigation*, 812 F. Supp. 2d 390, 412 (S.D.N.Y. 2011) ("[I]t is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery

imposed by [*Illinois Brick*]."); *In re New Motor Vehicles Canadian Export Antitrust Litigation* ("*In re NMV*"), 350 F. Supp. 2d 160, 211 (D. Me. 2004) (holding similarly). Other courts have applied this doctrine to state-level antitrust statutes as well. *See, e.g., In re DDAVP Indirect Purchaser Antitrust Litigation*, 903 F. Supp. 2d 198, 232-33 (S.D.N.Y. 2012); *In re Microsoft Corp. Antitrust Litigation*, 241 F. Supp. 2d 563, 565 (D. Md. 2003); *In re NMV*, 350 F. Supp. 2d at 211.

The Court is persuaded that the logic of these holdings should extend generally and bar all litigants who lack antitrust standing from bringing identical claims under a common law theory of unjust enrichment. Certainly, if such plaintiffs were permitted to repackage their antitrust claims as unjust enrichment actions, the entire thrust and purpose of the antitrust standing doctrine would disintegrate. Practically, if economic harm caused by market manipulation was cognizable on a theory of unjust enrichment, the antitrust laws themselves would be superfluous. Therefore, because they lack antitrust standing on their Sherman and Donnelly Act claims, plaintiffs cannot advance identical claims under a theory of unjust enrichment. Summary judgment must be, and is, awarded to defendants on those claims.

### f. Intentional Infliction of Emotional Distress

Seeming far out of place in a commercial setting, plaintiffs sue for intentional infliction of emotional distress[7] on the grounds that defendants "knew or should

---

[7]    In their complaint, plaintiffs sue merely for "emotional distress," not specifying whether their claim is for negligent or intentional infliction of emotional

have known that emotional distress was the likely result of their collusion to deprive Plaintiffs and others from being able to compete in a free and open competitive marketplace," and that their "extreme and outrageous" conduct in fact caused emotional distress to plaintiff Hong. (Compl. ¶¶ 116-21). A tort of this nature obligates a plaintiff to show "extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350 (1993). "In practice, courts have tended to focus on the outrageousness element, the one most susceptible to determination as a matter of law." *Id.* This standard is "rigorous, and difficult to satisfy. . . . Indeed, of the intentional infliction of emotional distress claims considered by the [New York Court of Appeals], every one has failed because the alleged conduct was not sufficiently outrageous." *Id.* at 122 (internal quotations omitted). For a plaintiff to succeed, the defendant's conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotations omitted).

Plaintiffs allege two distinct categories of conduct that they believe qualify as "extreme and outrageous": defendants' alleged operation of the price-fixing scheme itself, and defendants' statements and actions pressuring Hong to join in that

---

distress—two distinct causes of action under New York law. (Compl. ¶¶ 116-21). However, plaintiffs clarify in their brief that their claim is one for intentional infliction. (Pls.' Mem. at 26-27).

scheme. (*See* Compl. ¶¶ 117-18; Pls.' Mem. at 26-27). As to the latter category, plaintiffs specifically allege that Kim told Hong that he "should raise his price or be put out of business," and that C.J. Lee "also threatened [Hong] that he would make it 'very difficult' for him to continue his business operation" after Hong filed one of the Blue House [i.e., the South Korean government] complaints. (Pls.' Mem. at 26-27).

Accepting these allegations as true for argument's sake, plaintiffs cannot ascend *Howell's* steep stairs to the necessary threshold showing. Despite its potential illegality, the mere existence of the price-fixing scheme cannot satisfy the first *Howell* element: it simply is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." 81 N.Y.2d at 122. "A wide range of conduct—though offensive or even otherwise illegal—is not considered 'utterly intolerable in a civilized society' to support a cause of action for intentional infliction of emotional distress." *Neufeld v. Neufeld*, 910 F. Supp. 977, 984 (S.D.N.Y. 1996) (collecting cases in which conduct that was unlawful, including racial discrimination and sexual harassment, was nonetheless found not to satisfy the first *Howell* element). Furthermore, the price-fixing scheme was not directed at plaintiffs, and there is no evidence that defendants intended, nor had any reason to foresee, that plaintiff would be emotionally harmed merely by the existence of the arrangement.

Nor do plaintiffs' other allegations demonstrate "extreme and outrageous" conduct. Kim's putative statement that Hong "should raise his price or be put out of business," and Lee's alleged threat to make it "very difficult" for Hong's business to survive, may have been offensive, but they do not rise to the level of patent outrageousness. *See, e.g., Novak v. Rubin*, 129 A.D.2d 780, 781, 514 N.Y.S.2d 523 (2d Dep't 1987) (defendant's threat to ruin plaintiff's wife's career if plaintiff pursued a lawsuit against him was, "as a matter of law, simply not 'outrageous' enough to support . . . a claim [for intentional infliction of emotional distress]"); *Huzar v. State*, 156 Misc.2d 370, 374-75, 590 N.Y.S.2d 1000, 1004 (N.Y. Ct. Cl. 1992) (dismissing similar claim premised on allegation that the defendant threatened to have plaintiff fired if she did not drop her worker's compensation claim).

Succinctly, the record evidence does not come close to demonstrating conduct that would support a claim for intentional infliction of emotional distress. Consequently, the Court grants summary judgment to defendants.

### g. *Promissory Estoppel*

Finally, plaintiffs move against KBSA on a theory of promissory estoppel. (*See* Compl. ¶¶ 122-27). Under New York law, a party may recover damages in the absence of a written contract if it can show "(1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by [that] party; and (3) injury caused by the reliance." *MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 87 A.D.3d 836, 841-42, 929 N.Y.S.2d 571, 577 (1st Dep't 2011). Wielding the

sabre of promissory estoppel, plaintiffs thrust with the following allegations: that KBS "made a clear and unambiguous oral promise that, if plaintiff Hong would buy an existing store and obtain the accompanying license, it would supply the store with its product;" that KBS[A] failed to disclose that "it would honor the foregoing commitment only if Hong would enter into an illegal conspiracy and agreement in restraint of trade;" that Hong "[r]easonably reli[ed] on KBS[A]'s promise" and "purchased a store and obtained the accompanying license;" and that "KBS[A] now refuses to deal with Plaintiffs and supply their store with its product," on account of which "Plaintiffs have suffered and continue to suffer damages." (Compl. ¶¶ 123-27).

KBSA, in turn, raises the shield of the Statute of Frauds, which "requires a written contract for an agreement that is not to be performed within one year of its making." *Sheehy v. Clifford Chance Rogers & Wells LLP*, 3 N.Y.3d 554, 560, 822 N.E.2d 763, 766, 789 N.Y.S.2d 456, 459 (2004) (citing G.O.L. § 5–701(a)(1)). As KBSA correctly observes, a plaintiff may "avoid the application of the Statute of Frauds by relying on the doctrine of promissory estoppel . . . only where the aggrieved party can demonstrate it would be unconscionable" to apply the Statute of Frauds. *Steele v. Delverde S.R.L.*, 242 A.D.2d 414, 415, 662 N.Y.S.2d 30, 31 (1st Dep't 1997). Plaintiffs riposte that the Statute of Frauds does not apply to the alleged oral agreement between Hong and KBSA because Hong could—and, in fact,

did—perform his contractual obligation within a year's time: purchasing the Shilla store and moving the business to a Queens location. (Pls.' Mem. at 29).

Plaintiffs' argument misses the mark. "In order to remove an agreement from the application of the statute of frauds, *both parties* must be able to complete their performance of the contract within one year." *Sheehy*, 3 N.Y.3d at 560 (emphasis added). As plaintiffs describe it, KBSA's end of the bargain was to provide them with a continuous supply of KBS videos once they opened their new store, regardless of its location. There is no evidence that the parties agreed to (or even discussed) an end date for KBSA's performance, and plaintiffs do not assert that such an end date existed. Hence, either the contract was terminable at will by either party—in which case there was no "unambiguous promise" that KBSA would continue to supply videos indefinitely, granting KBSA a contractual right to terminate supply at any time and vitiating any promissory estoppel claim—or, on the other hand, the contract was one of indefinite duration, in which case the Statute of Frauds applies. *See, e.g., D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 467, 472 N.E.2d 992, 995, 483 N.Y.S.2d 164, 167 (1984) ("[T]he oral agreement between the parties called for performance of an indefinite duration . . . . As such, the agreement fell within the Statute of Frauds and was void."); *Rosen v. Hyundai Group (Korea)*, 829 F. Supp. 41, 48-49 (E.D.N.Y. 1993) (Statute of Fraud applied to oral supply contract of indefinite duration).

Therefore, promissory estoppel here is barred by the Statute of Frauds unless there is evidence that the grievant would otherwise suffer "unconscionable injury." *Dunn v. B & H Associates*, 295 A.D.2d 396, 397, 743 N.Y.S.2d 546, 548 (2d Dep't 2002). Plaintiffs fail to meet this demanding standard. In an effort to do so, they assert that they invested some $200,000 in their business on the basis of KBSA's alleged representations, and that enforcement of the agreement is necessary to prevent defendants from "continu[ing] to violate antitrust laws and continu[ing] to engage in unlawful restraint of trade." (Defs.' Mem. at 29-30). Plaintiffs cite no authority for the proposition that injury of this nature, which the Court has found they lack standing to assert, is unconscionable. In fact, the case law indicates the opposite. *See, e.g., United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 406 (S.D.N.Y. 2001) ("[T]he loss of money invested in the business ... is precisely the injury that flows naturally from the non-performance of an oral agreement," and is therefore not an unconscionable injury); *Eber-NDC, LLC v. Star Indus., Inc.*, 42 A.D.3d 873, 874-75, 839 N.Y.S.2d 650, 651-53 (4th Dep't 2007) (no unconscionable injury despite plaintiff's "substantial investment ... by expanding its warehouse and its staff" in response to oral promise); *Blinds and Carpet Gallery, Inc. v. EEM Realty, Inc.*, 34 Misc.3d 1228(A), 951 N.Y.S.2d 85, at *4-5 (Sup. Ct., Kings Cnty., 2012) (plaintiffs who invested $700,000 in anticipation of lease renewal did not suffer unconscionable injury). Whether or not antitrust violations were involved is immaterial. Whatever the motivation for KBSA's alleged breach of an

agreement to supply its product, there is no evidence of unconscionable injury. As a consequence, Plaintiffs' promissory estoppel claim is barred by the Statute of Frauds.

Though not relied upon by the Court for its disposition, it appears that plaintiffs' promissory estoppel claim would fail on another ground—their failure to show that KBSA *unambiguously* promised to provide a constant supply of KBS videos to them after their relocation to Queens. *See, e.g., Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 264 (2d Cir. 1984) (promissory estoppel claim was properly dismissed due to lack of a "clear and unambiguous promise" by the defendant). Even assuming that KBSA employee Jo represented at the dinner meeting that KBSA would continue to honor the Shilla store's license after plaintiffs' move to Queens, it is highly uncertain whether Jo had, as plaintiffs argue, actual or apparent authority to make a binding promise on behalf of his employer, or that he sought to do so. (*See* Pls.' Mem. at 28). The KBSA litigants characterize Jo as a mere "deliveryman," and vigorously deny that he had (or even suggested he had) any such authority. (KBSA's 56.1 ¶¶ 58-59). Indeed, J.H. Lee admitted in his deposition that neither Jo nor anyone else represented that Jo had independent authority to negotiate a supply agreement with plaintiffs on behalf of KBSA. (Geercken Decl., Exh. M, 222:8-223:22). The representations made at the February 2004 dinner meeting, and the nature of Jo's actual or apparent authority to enter into an agreement on behalf of KBSA, could hardly be more ambiguous on the undisputed

41

facts. Summary judgment, notwithstanding formal and final determination on this aspect, is, at bottom, warranted and awarded to KBSA on this claim.[8]

II. KBSA's Counterclaims

a. *Copyright Act*

KBSA[9] seeks damages at law from Hong, Hwan Media, and J.H. Lee ("the Samsung owners") for violations of our national Copyright Act, 17 U.S.C. § 101 *et seq.* Specifically, it is alleged that the Samsung owners copied and distributed, without a license or other approval, programming for which KBSA possessed a sole and exclusive North American license. (*See* Am. Ans., Counterclaims, ¶¶ 68-76). The Samsung owners respond that KBSA has failed to establish that it owned any such copyrights, and, in any case, that the actions of the counterclaim defendants were permitted under the terms of their oral license with KBSA. (Pls.' Mem. at 32-33).

To prevail on a copyright infringement claim, a claimant must show "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003). As to the first element, the Second Circuit has determined that "[t]he Copyright Act authorizes only two types of claimants to sue for copyright infringement: (1) owners of

---

[8]  Plaintiffs' requests for punitive damages for claims 14 through 17 are dismissed along with those claims. However, because the Court denies summary judgment as to claims 11 through 13 at this time, it similarly declines to dismiss plaintiffs' request for punitive damages on those claims.

[9]  C.J. Lee also joins KBSA on these copyright (and other) counterclaims. For the sake of simplicity, the Court refers to the KBSA and C.J. Lee claims together as "KBSA's claims."

copyrights, and (2) persons who have been granted exclusive licenses by owners of copyrights." *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 32 (2d Cir. 1982), *superseded by rule and statute on other grounds*. The court in *Eden Toys* expressly rejected the argument that a person other than a copyright owner or exclusive licensee may sue for copyright infringement, even if explicitly authorized to do so by the copyright owner. *Id.* at 32 n. 3 (citing 17 U.S.C. § 501(b)); *see also ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("[T[he Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf.").

KBSA contends that it satisfies the first *Jorgenson* element because it is "the assignee of the copyrights of KBS content distributed throughout the United States." (KBS Defs.' Mem. at 36; *see also* Am. Ans. at 69 ("Since approximately July or August 2004, Counterclaim Plaintiff KBS America was the sole and exclusive licensee of Content in North America, including, without limitation, the United States."); KBSA's 56.1 ¶ 61). In support, KBSA offers five items of evidence: the declaration of C.J. Lee (Geercken Decl., Exh. N ¶ 15); the affidavit of Kevin Kwon ("Kwon Aff." (Dkt No. 36)); excerpts from Kwon's deposition (Geercken Reply Decl. (Dkt. No. 140), Exh. C); a letter to Kwon from Mun-Ki Eun, Head of Global Strategy for KBS (Geercken Decl., Exh. N, sub-Exh. A); and copies of the licensing agreement between KBS World[10] and KBSA (titled "KBS World Channel and

---

[10]  "KBSA World" appears to be the name for KBS's Korean headquarters. (*See* Geercken Reply Decl., Exh. C, 271:21-22).

Content Business Agreement") in both the original Korean and an English translation. (Geercken Reply Decl., Exhs. A-B). The Samsung owners object that this evidence does not sufficiently demonstrate the existence of an exclusive license agreement between KBS and KBSA.

Upon reviewing KBSA's proffered evidence, the Court determines that there is a genuine dispute of material fact as to whether or not KBSA's license was exclusive. On the one hand, Kwon states in his affidavit that, "[i]n July 2004, KBS entered into an exclusive license agreement with KBS America, pursuant to which KBS America became the sole and exclusive licensee of KBS programming in North America." (Kwon Aff. ¶ 3). C.J. Lee makes a similar statement in his declaration. (C.J. Lee Decl. ¶ 15).

On the other hand, nowhere in the excerpted deposition testimony does Kwon confirm that KBSA's licensing agreement with KBS was intended to be exclusive. (*See* Geercken Reply Decl., Exh. C, 271:4-276:2). More importantly, the actual terms of KBSA's licensing contract with KBS neither state nor suggest that KBSA would be the sole and exclusive distributor of KBS programming in North America. (*See generally* Geercken Reply. Decl., Exh. B).[11] Quite to the contrary, the language of the contract is explicit that KBS retains the right to distribute its own

---

[11] The licensing contract is properly offered as evidence of its legal effect on the contracting parties. *See United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("[S]tatements affecting the legal rights of parties . . . are excluded from the definition of hearsay.").

programming content in North America. (*See id.*, § 1(3) ("[KBS] may directly distribute content to North America as deemed necessary for [its] business.")). By their very nature, exclusive licenses grant the licensee rights to utilize copyrighted material to the exclusion of all others—*including the licensor. See Davis v. Blige*, 505 F.3d 90, 101 (2d Cir. 2007) ("[A]n exclusive licensee may sue others for infringement, *including the licensor* if the licensor infringes on the exclusive right he granted the licensee.") (emphasis added). *See also* Black's Law Dictionary 1003 (9th Ed. 2009) (defining an "exclusive license" as one that "gives the licensee the sole right to perform the licensed act, often in a defined territory, and *that prohibits the licensor from performing the licensed act* and from granting the right to anyone else; esp., such a license of a copyright, patent, or trademark right") (emphasis added); *Corbello v. DeVito*, 832 F. Supp. 2d 1231, 1244 (D. Nev. 2011) ("[T]he difference between 'exclusive' and 'nonexclusive' licenses concerns the continuing ability of the grantor to use or further license to others the licensed property during the period the license is in effect.").

The contract does, admittedly, require KBSA to "secure at [its] own expense the copyright and copyright acknowledgements which [KBS] has not secured," and provides that "[KBS] may represent [KBSA] in negotiations involving [KBSA's] copyright agreement." (Geercken Reply. Decl., Exh. B § 5). Yet, there is no evidence that KBS failed to secure any copyrights for its programming, that KBSA in fact acquired those copyrights, or that those particular materials ever appeared in the

45

Samsung store. Furthermore, although the contract purports to delegate to KBSA the authority and/or duty to protect KBS's copyrights from infringement (*see id.* § 6), *Eden Toys* makes clear that a copyright owner cannot, by contract or otherwise, grant a non-exclusive licensee the right to sue for copyright infringement. 697 F.2d at 32 n. 3; *see also ABKCO Music*, 944 F.2d at 980.

As for the June 2005 letter that KBS official Mun-Ki Eun sent to Kwon, which purportedly confirms the exclusive nature of KBSA's license, it is an out-of-court statement offered to prove the truth of the statements made in it, and is therefore inadmissible hearsay. Fed. R. Evid. 801(c); *U.S. v. Pedroza*, 750 F.2d 187, 199-200 (2d Cir. 1984). As such, the Court may not consider it on a motion for summary judgment. *Feingold v. New York*, 366 F.3d 138, 155 n. 17 (2d Cir.2004).[12] Considering it nonetheless would change nothing. While the letter and Kwon's testimony might suggest that KBSA had an exclusive licensing agreement with KBS, the language of the contract itself appears to directly contradict that assertion. As such, there remains a question of material fact as to whether KBSA held either a copyright or an exclusive license over any of the KBS programming that plaintiffs

---

[12] It could be argued that this letter is admissible non-hearsay because KBSA has offered it as evidence of its legal effect: a *post hoc* confirmation of an exclusive license agreement, in satisfaction of 17 U.S.C. § 204(a)'s requirement that such arrangements be made in writing. *See Dupree*, 706 F.3d at 137; *Eden Toys*, 697 F.2d at 32. Yet KBS and KBSA do not claim that they ever had an oral agreement that required *post hoc* confirmation under § 204(a); rather, their licensing contract from July 2004 was already made in writing and is included as evidence, as discussed above. (*See* Geercken Reply. Decl., Exhs. A and B). Accordingly, the June 2005 letter appears to have no legal effect.

allegedly rented at the Samsung location. Summary judgment is, therefore, inappropriate.[13]

Moreover, and critically on this motion, there is also a dispute of material fact as to whether the Samsung owners actually "violat[ed] . . . the Shilla license." (KBSA's Mem. at 36). KBSA claims that its licenses with video store owners are site-specific, and permit stores to rent to walk-in customers only. (KBSA's 56.1 ¶¶ 4-6; C.J. Lee Decl. ¶¶ 35-37). In support, KBSA has offered affidavits from various Korean video store owners in the New York area affirming that their licenses with KBSA included those limitations and that they had always understood them. (See C.J. Lee Decl, Exh. C). According to KBSA, by moving the Shilla store to Queens without authorization, and by renting to non-walk-in customers, the Samsung owners violated the terms of the license they acquired upon purchasing the Shilla store. (Am. Ans., Counterclaims ¶ 71; C.J. Lee Decl. ¶¶ 35-37, 62-69, 80). KBSA claims that the Samsung owners were instructed not to rent KBS content at a location other than the Shilla location, but that they nonetheless rented those videos at the Samsung location after the move, and that Hong expressed remorse when C.J. Lee discovered this practice. (KBSA's 56.1 ¶¶ 28, 30; C.J. Lee Decl ¶¶ 71-74). KBSA

---

[13] Citing *Eden Toys*, 697 F.2d at 36-37, KBSA argues that "an infringer may not question the sufficiency of a writing between a copyright owner (here KBS) and its licensee (here, KBSA), as a defense to the claim of infringement." (KBSA Defs.' Reply at 19). Yet, Hong and J.H. Lee have not attacked the legal sufficiency of KBS's license with KBSA under § 204(a); they have simply denied that there is record evidence attesting to the exclusive nature of that license. (*See* Pls.' Mem. at 32). Because the Court holds that a material dispute of fact exists as to that question, it denies summary judgment.

further claims that these alleged license violations were the reasons that it cut off the Samsung store's supply of KBS videos. (KBSA's 56.1 ¶¶ 35-36).

The Samsung owners vigorously parry that they did not violate the terms of their oral agreement with KBSA.[14] In particular, they attest that the license they acquired from KBSA was not limited to the Shilla location only, or to walk-in customers only, but would automatically transfer to the Queens location, and permitted rental to home delivery customers in addition to walk-in customers. (Pls.' 56.1 ¶¶ 3-5, 13, 63; Hong Decl. ¶¶ 10-12). They further attest that Jo approved of and ratified their plan to move their store to the Queens location, and that he assured them that the Shilla license would transfer to the new store. (Pls.' 56.1 ¶¶ 26, 28, 31-32, 35, 58-59; Hong Decl.¶¶ 10-14). As a result, the Samsung owners dispute that they violated in any manner the terms of their agreement with KBSA as negotiated through Jo.

In serendipity with these claims, the Samsung owners also contend that KBSA cut off their supply of KBS video programming not because of an alleged

---

[14]  As KBSA points out, Hong admitted at his deposition that he rented to customers videos of Korean sporting events, originally broadcast in Korea on KBS, without authorization or a license. (KBSA's Mem. at 37; Geercken Decl., Exh. J, 30:9-36:21; KBSA 56.1 ¶ 33). The Samsung owners counter that "[t]here is no evidentiary proof . . . that KBS owned a valid copyright to the sports programming except the letter from Mun-Ki Eun [to Kwon] . . . that purportedly claimed that KBS entered into an exclusive license agreement with [KBSA]." (Pls.' 56.1 ¶ 62). The Court assumes they meant there is no evidence that *KBSA* held a valid copyright to the sports programming. In any event, as discussed previously, there is a material dispute of fact as to the nature of KBSA's license, and summary judgment is therefore denied with regard the Samsung owners' allegedly unauthorized rental of KBS sports programming as well.

license breach, but because they refused to abide by the terms of the alleged price-fixing scheme that other Korean video stores were operating. (Pls.' 56.1 ¶ 34). Hong specifically testified at his deposition that C.J. Lee "admitted that the reason that [KBSA] could not resume supplying [his] store was the complaints launched by defendants Kong and Kim based upon my violation of the price-fixing agreement between the local Korean video rental storeowners, and for that reason alone [KBSA] would no longer be able to supply me with their videos." (Hong Decl. ¶ 27).

It is clear from these highly divergent narratives that there is a genuine dispute of material fact as to the terms of the Samsung owners' agreement with KBSA. Both parties have presented competent evidence supporting their interpretation of the agreement. For instance, KBSA has provided affidavits from other store owners indicating the general nature of KBSA licenses, as well as testimony that the Samsung owners were warned not to rent videos under the Shilla license after they had moved their retail operations to the Queens location. (KBSA's 56.1 ¶¶ 28, 30; C.J. Lee Decl. ¶¶ 71-74, Exh. C). The Samsung owners, for their part, have offered testimony from multiple witnesses that Jo affirmatively represented that KBSA would continue supplying videos to them after they moved their store from Brooklyn to Queens. (Asher Decl., Exh. A ¶¶ 39:3-40:7, 51:10-57:19; Hong Decl. ¶¶ 10-14). Whether or not Jo had actual or apparent authority to negotiate a contract on behalf of KBSA, his statements to the Samsung owners are surely of evidentiary value as to the nature of their agreement with KBSA, as is C.J.

Lee's alleged statement that KBSA was terminating Samsung owners' video supply solely on account of their failure to join the price-fixing scheme. (Hong Decl. ¶ 27). Quite simply, "[e]vidence presented at trial is the only means by which the terms of this [alleged] oral contract" to license plaintiffs to offer KBS videos for rental can be identified, "and summary judgment [on a copyright claim essentially intertwined with that contract] is therefore inappropriate in this instance." *May Ship Repair Contracting Corp. v. Barge Columbia N.Y.*, 160 F. Supp. 2d 594, 598 (S.D.N.Y. 2001).[15]

### b. Defamation Claims

Finally, KBSA sues the Samsung owners for libel *per se* and slander *per se* based on written and oral statements that Hong and/or Lee allegedly made about KBSA and/or C.J. Lee. (*See* Am. Ans. ¶¶ 49-67). To prevail on a defamation claim, a plaintiff must show that the defendant made a "false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a

---

[15] KBSA denies that counterclaim defendants had any valid license at all to copy KBS videos because their agreement was not in writing, and thus legally void under New York's Statute of Frauds, G.O.L. § 5–701(a)(1). (KBSA's Mem. at 36-37). Although this statute bars plaintiffs' promissory estoppel claim, KBSA fails to cite a single case permitting a plaintiff to wield a state-level statute of frauds as a sword in a Copyright Act case. Furthermore, at least one court has held that non-exclusive oral licenses are permitted under the Copyright Act's own Statute of Frauds—17 U.S.C. § 204(a) —regardless of G.O.L. § 5-701(a)(1). *See Holtzbrinck Pub. Holdings, L.P. v. Vyne Communications, Inc.*, No. 97 CIV. 1082, 2000 WL 50286, at **6-7 (S.D.N.Y. Apr. 26, 2000); *see also Robinson v. Buy-Rite Costume Jewelry, Inc.*, No. 03 Civ. 3619, 2004 WL 1878781, at *4 (S.D.N.Y. Aug. 23, 2004) (under the Copyright Act, "a non-exclusive license may be written or oral"). Hence, the Court holds that § 5-701(a)(1) does not bar a defense under the Copyright Act that the alleged infringer held a non-exclusive oral license from the copyright owner to use the copyrighted material.

minimum, a negligence standard, and it must either cause special harm or constitute defamation *per se*." *Epifani v. Johnson*, 65 A.D.3d 224, 233, 882 N.Y.S.2d 234, 242 (2d Dep't 2009). In the absence of special damages—that is, pecuniary or economic losses, *G.L. v. Markowitz*, 101 A.D.3d 821, 826, 955 N.Y.S.2d 643, 648 (2d Dep't 2012)—a plaintiff must show that the statement, if written, "tended to expose him to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Frank v. Nat'l Broadcasting Co., Inc.*, 119 A.D.2d 252, 255, 506 N.Y.S.2d 869, 871 (2d Dep't 1986) (internal quotations omitted). If the statement is oral, it must also fall into one of four specified categories, which include statements that "tend to injure another in his or her trade, business or profession." *Zherka v. Gribler*, 101 A.D.3d 864, 864, 954 N.Y.S.2d 893, 893 (2d Dep't 2012) (internal quotations omitted).

"Truth is an absolute defense to an action based on defamation." *Goldberg v. Levine*, 97 A.D.3d 725, 726, 949 N.Y.S.2d 692, 693 (2d Dep't 2012) (internal quotations omitted). Where the parties are private entities and the statements concern matters of only private concern, the defendant bears the burden of proving the statement's truth as an affirmative defense. *See Grieco v. Galasso*, 297 A.D.2d 659, 660, 747 N.Y.S.2d 120, 122 (2d Dep't 2002). By the same token, "only statements alleging facts can properly be the subject of a defamation action;" statements of opinion are not actionable. *Russell v. Davies*, 97 A.D.3d 649, 650, 948

N.Y.S.2d 394, 396 (2d Dep't 2012) (internal quotations omitted). In distinguishing fact from opinion, a court must consider "(1) whether the specific language has a precise meaning that is readily understood, (2) whether the statements are capable of being proven true or false, and (3) whether the context in which the statement appears signals to readers that the statement is likely to be opinion, not fact." *Id.* "The dispositive inquiry is whether a reasonable reader could have concluded that the statements were conveying facts about the plaintiff." *Id.* (internal quotations omitted).

Lastly, courts have recognized several privileges that shield declarants from liability even if their statements are defamatory. "A qualified privilege arises when a person makes a bona fide communication upon a subject in which he or she has an interest, or a legal, moral, or social duty to speak, and the communication is made to a person having a corresponding interest or duty." *Silverman v. Clark*, 35 A.D.3d 1, 10, 822 N.Y.S.2d 9, 16 (1st Dep't 2006) (internal quotations omitted). A party claiming defamation can only overcome this privilege by showing that the defendant made the statement with "actual malice"—that is, with awareness that the statement was false or with reckless disregard as to its truth or falsity. *See Diaz v. Espada*, 8 A.D.3d 49, 50, 778 N.Y.S.2d 38, 40 (1st Dep't 2004). Furthermore, "[s]tatements made by parties, attorneys, and witnesses in the course of a judicial or quasi-judicial proceeding are absolutely privileged, notwithstanding the motive with which they are made, so long as they are material and pertinent to the issue to be resolved in the

52

proceeding." *Wilson v. Erra*, 94 A.D.3d 756, 756-57, 942 N.Y.S.2d 127, 129 (2d Dep't 2012) (internal quotations omitted).

KBSA attributes three distinct categories of defamatory statements to the Samsung owners. First, KBSA claims that they made false oral statements to several reporters that "KBSA had wrongfully terminated supply" of KBSA videos. (KBSA's 65.1 ¶¶ 37, 64; C.J. Lee Decl. ¶¶ 90-94). Second, KBSA charges that the partners sent a letter to KBSA president and CEO Kwon ("the Kwon letter") making "false . . . accusations . . . [of] wrongdoing and/or improper behavior by C.J. Lee." (KBSA's 56.1 ¶ 65; Kwon Aff., Exh. 1). Third, KBSA contends that Hong filed the two Blue House complaints falsely accusing KBSA of "oppressing small businesses . . . and in some cases destroying their livelihood," and claiming that C.J. Lee threatened Hong and solicited and/or accepted bribes from video store owners. (KBSA's 56.1 ¶¶ 66-67; C.J. Lee Decl. ¶¶ 117-124, Exhs. M-N). The Samsung owners respond that KBSA has failed to demonstrate that the statements attributed to them were either false or defamatory. (*See* Pls.' Mem. at 34-39). They further claim that their statements in the Kwon letter are entitled to a qualified privilege, and that KBSA has failed to produce evidence sufficient to overcome that privilege. (*See id.* at 367).

In its Amended Answer, KBSA claims that these allegedly defamatory statements "damaged the business reputations of [KBSA] and the business and personal reputation of . . . C.J. Lee . . . [causing him] severe emotional distress."

(Am. Ans. ¶¶ 55-56). However, it offers no actual evidence that these statements caused either KBSA or C.J. Lee pecuniary or economic harm. Accordingly, KBSA can only prevail by establishing, that the alleged statements constitute defamation *per se*. *See McCart v. Morris*, 58 A.D.2d 700, 700, 396 N.Y.S.2d 107, 108 (3d Dep't 1977) ("Absent allegations or proof of special damages, the question is whether the statements complained of are libel or slander *per se*.").

    i.      Oral Statements to Reporters

KBSA claims to have learned through "inquiries from reporters" that, after their supply of videos was cut off, the Samsung owners organized a press conference with reporters from the Korean-American media at which the counterclaim defendants "accused KBSA of wrongful behavior in terminating the Shilla license." (KBSA's 56.1 ¶¶ 37, 64). Although Jo and C.J. Lee purport to elaborate on the nature of these statements in their declarations, they rely solely on the accounts of others who either heard or heard about the statements. (*See* C.J. Lee Decl. ¶¶ 85-93, Exh. Q ¶¶ 51-52). Accordingly, their testimony is hearsay, and may not be considered by the Court as evidence of the contents of any such statements. *See, e.g., Arnheim v. Prozeralik*, 266 A.D.2d 855, 855, 697 N.Y.S.2d 431, 431 (4th Dep't 1999) (rejecting as hearsay testimony by plaintiff's attorney regarding defamatory statements that were reported to him but not made to him directly).

The only admissible evidence in the record bearing on these statements is the deposition of J.H. Lee, at which he testified that he and/or Hong contacted Neoyul

Kim, Jin Se Kim, and Jong Hoon Kim—reporters from the Korean-American press—to discuss their conflict with KBSA. (Geercken Deck., Exh. M, 266:18-275:2). J.H. Lee testified as follows:

> I explained to Neoyul Kim that we were receiving the tapes supplies through normal business relationship and suddenly the tapes supply stopped, and because of this, it affected Mr. Hong's business really terribly and Mr. Hong had just opened a business with the help of his father's loan. This was just to feed his wife and his kid and now he couldn't even support himself, and I said that—I complained this was not a proper disposition.

(*Id.* 267:6-15). He further testified that, in response to this press conference, "there was an article [written] that mentioned that there would be a possibility of a lawsuit between KBS arising out of—arising between KBS and Samsung." (*Id.* 268:10-13). He also stated that Hong contacted Jin Se Kim and Jong Hoon Kim, and while he did not relay the contents of that conversation, he asserted that Hong told him he was "very upset. He said all this is very unfair, pushing him to close his store. . . . [t]hat this situation should be known to the world and that . . . he was entitled to conduct—continue his business fairly or he was entitled to be treated fairly." (*Id.* 269:10-12, 16-23). Finally, he testified that he and Hong arranged a dinner with the three reporters in order to "let them know exactly what we had explained to Neoyul Kim before, the fact that we were treated unfairly by stopping—by not having the tapes supplies all of a sudden." (*Id.* 271:12-14). J.H. Lee specifically denied mentioning C.J. Lee or Jo at this meeting, asserting instead that he and Hong attributed these actions solely to KBSA. (*Id.* 273:4-10).

These statements to the reporters, as relayed by J.H. Lee, do not constitute defamatory speech. In sum and substance, the Samsung owners asserted that KBSA suddenly cut off supply of KBS videotapes to the Samsung store—an undisputed fact—and that this action was unfair and "not a proper disposition." Under the three factors described in *Russell v. Davies*, 97 A.D.3d at 650, the latter contention (the unfairness of the KBSA cut-off) is quite clearly a non-actionable statement of opinion than an assertion of fact. To remark that a particular business decision directed at the speaker's interest is "unfair" or "not a proper disposition" does not convey a definite meaning that is precisely understood, and cannot be proven objectively true or false. Taken in context, there is little doubt that these statements reflected the Samsung owners' emotionally-charged opinions in response to the sudden cessation of KBS videos, rather than false assertions of fact.

It is true that statements of opinion may be defamatory if they "imply the existence of undisclosed underlying facts that would support defendant's opinion and would be detrimental to plaintiffs." *Giffuni v. Feingold*, 299 A.D.2d 265, 266, 749 N.Y.S.2d 716, 716 (1st Dep't 2002) (internal quotations omitted). The statements at issue here do not entail any such implications. Based on the evidence presented, there is no indication that either Hong or J.H. Lee even hinted at KBSA's reasons (illegal or otherwise) for terminating their video supply, nor did either of them make any reference to the alleged price-fixing scheme they charge in the lawsuit. They

merely explained what happened to their business and expressed their outrage as a result of it.

At most, the two partners implied that KBSA had breached a contract with them by cutting off their supply of KBS videos. But, without more, such an assertion is not defamatory. Courts have repeatedly held that an accusation that a party has breached a contract or other legal agreement is not defamatory *per se* unless the declarant has made or implied additional defamatory assertions of fact. *See, e.g., Phillips v. Carter*, 58 A.D.3d 528, 872 N.Y.S.2d 22, 23 (1st Dep't 2009) ("While the complaint alleges defendant falsely told the third party that plaintiff had breached his contract and 'could not be trusted as a contract partner,' it fails to state a claim for defamation . . . [because] [the] statements were either true *or unactionable opinion.*") (emphasis added); *Belly Basics, Inc. v. Mothers Work, Inc.*, 95 F. Supp. 2d 146-48 (S.D.N.Y. 2000) (statement that plaintiff "seems not to care in the least about its legal agreements," implying it had breached a particular settlement agreement, was a subjective opinion, and therefore not defamatory); *In re Andrew Velez Const., Inc.*, Bankruptcy No. 06–12765 (MG), 2008 WL 68746, at *4 (Bankr. S.D.N.Y. Jan. 04, 2008) (statement that plaintiff breached a contract "[is] not itself sufficient to state a claim for defamation *per se*," but requires further reference to, or implication of, specific wrongful conduct by the plaintiff in relation to the breach); *Cummins v. Suntrust Capital Markets, Inc.*, 649 F. Supp. 2d 224, 256 (S.D.N.Y. 2009) (statement indicating that corporate officer may have breached his fiduciary duty

was an expression of subjective opinion, and not actionable). In sum, the Samsung owners' oral statements to reporters, as described in the testimony of J.H. Lee, are not defamatory. There being no admissible evidence to the contrary that would create a genuine issue of material fact, and KBSA's motion for summary judgment is denied as to those remarks; and, searching the record *sua sponte*, the Court grants summary judgment to counterclaim defendants.

ii.     The Kwon Letter

Next, KBSA contends that the two partners defamed C.J. Lee in the Kwon letter. (*See* Kwon Aff., Exh. 1; *see also* KBSA's 56.1 ¶ 65; KBSA's Mem. at 37-38). This letter concerns the dispute between the store owners, on the one hand, and KBSA's Eastern regional office, on the other hand, over the termination of KBS videos to the Samsung store. More generally, the letter deals with a conflict that threatened to disrupt or destroy an otherwise mutually beneficial business relationship between the two parties. As such, the letter is a "communication[]" between parties on matters in which they share a common interest," *Gondal v. N.Y.C. Dept. of Educ.*, 19 A.D.3d 141, 142, 796 N.Y.S.2d 594, 595 (1st Dep't 2005), and statements made in this sort of correspondence are immune from a defamation claim unless KBSA can allege and show malice. *Id.*

KBSA argues that the qualified privilege should not apply to the Kwon letter because "[c]ourts have generally limited this privilege to members of the same organization or entity, such as 'employees of an organization' or 'constituent

physicians of a health insurance plan.'" (KBSA's Reply at 23-24 (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 437, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992)). KBSA awkwardly fashions out of whole cloth this new requirement in an attempt to circumvent the qualified privilege. Neither *Liberman* nor any other case has indicated that the privilege applies only to communications between members of the same organization, and the decisional law thoroughly debunks any such interpretation. *See, e.g., In re Hoge*, 96 A.D.3d 1398, 1400, 946 N.Y.S.2d 350, 353 (4th Dep't 2012) (statements between two different companies regarding credit card use by one of the company's shareholders were qualifiedly privileged); *East Point Collision Works, Inc. v. Liberty Mut. Ins. Co.*, 271 A.D.2d 471, 471-72, 706 N.Y.S.2d 700, 701-02 (2d Dep't 2000) (qualified privilege applied to communications between insurance representative and owner of a car that was damaged by the insured automobile); *Liere v. Scully*, 79 A.D.3d 821, 912 N.Y.S.2d 690 (2d Dep't 2010) (a public official's comments to a reporter about suspected environmental violations by plaintiff were privileged, since "[the] reporter . . . and the public in general, had corresponding interests in the statements' subject matter"). The fact that the Samsung owners and Kwon were not members of the same organization is immaterial to a determination as to the propriety of invoking the qualified privilege.

KBSA takes another swipe at the privilege, built on the fact that the Samsung owners' interests were "diametrically opposed to those then espoused by KBSA . . . Indeed, the very goal of the Kwon letter is to address the conflict (not the unity of

interest) between [the store owners] and KBSA." (KBSA's Reply at 24). KBSA's rhetorical jiu-jitsu is impressively dexterous, but equally unpersuasive. The qualified privilege requires that the communicants share a *common, mutual,* or *corresponding* interest, not an *identical* interest. That is to say, they must both have some vested interest in the subject matter of the communications, but their respective interests need not be aligned. *See, e.g., Vinson v. Bryant and Stratton Business Institute, Inc.,* No. 92-CV-0762E (F), 1995 WL 307594, at *10 (W.D.N.Y. May 15, 1995) (finding that plaintiff's argument "confuses the law by attempting to require not a merely corresponding interest, but an identical one").

The New York Court of Appeals has specifically instructed that the purpose of the qualified privilege is to "foster . . . debate," and "to permit an interested participant to defend his position vigorously without fear of being penalized for his statements should some of them actually turn out to be erroneous." *Stillman v. Ford,* 22 N.Y.2d 48, 54, 238 N.E.2d 304, 307, 290 N.Y.S.2d 893, 898 (1968). It would not serve the policy goals that justify the privilege to require that the speakers' interests in the subject matter be identical, congruent, or even parallel. On the contrary, if the privilege exists to foster *debate,* and to permit parties to *defend* their positions, the privilege must *a fortiori* be all the more applicable when the communicating parties' interests are *opposed.* Other jurisdictions have recognized this principle. *See, e.g., Brown v. Collins,* 402 F.2d 209, 212 (D.C. Cir. 1968) (stating in dicta that "[p]ersons whose ultimate interests are diametrically opposed may nonetheless

share a mutual interest in minimizing their conflict and therefore may be conditionally privileged when they make defamatory statements inter sese to that end.").

In this case, Kwon, as the president and CEO of KBSA, and the Samsung owners, as KBSA's licensed customers, had a common interest in the business relationship between the two entities. Courts have recognized that a mutual interest of this nature is sufficient to trigger the qualified privilege. *See, e.g., Rupert v. Sellers*, 65 A.D.2d 473, 485, 411 N.Y.S.2d 75, 82 (4th Dep't 1978) (holding that the privilege applies to communications between parties "who share a common interest in the same property, business or *business relationship*") (emphasis added). More precisely, the parties had a common interest in avoiding further escalation of the dispute, negotiating an agreement, and avoiding litigation (unfortunately, a failed endeavor). The Kwon letter was clearly written in furtherance of settling the conflict. It may have failed in that regard, but because it concerned a topic on which both parties shared a common interest—their business relationship—it is shielded by the qualified privilege.

With no white flag in sight, KBSA counters that, even if the privilege applies, the Samsung owners "evince[d] actual malice in sending the Kwon Letter," because they "misrepresented . . . the timing and circumstances of their move from Brooklyn to Queens, and . . . what they were told as to why supply was stopped. In this regard, they attempt to shift the blame from their shoulders onto Mr. C.J. Lee, painting him

as a short-tempered autocrat who was causing KBSA not to live up to its obligations." (KBSA's Reply at 24-25 (internal citations omitted)). These facts, even if accurate, fail, as a matter of law, to establish that the store owners acted maliciously in sending the Kwon letter. First, even if they did misrepresent "the timing and circumstances of their move from Brooklyn to Queens," that statement refers to their own actions, not those of C.J. Lee—it cannot possibly be defamatory, nor does it manifest any showing of malice.

Nor is there fertile soil in KBSA's simple and conclusory assessment that the counterclaim defendants misrepresented "what they were told as to why supply was stopped." On that score, the Samsung owners stated in the Kwon letter that, several days after their supply of KBS videos was terminated,

> the employee of KBS America's East Coast Office whom we contacted initially for the relocation and other issues earlier explained to us that the main reason for the cessation was "because we made a threat to KBS by saying something to the effect that in the event KBS ceases the supply, we will create havoc for KBS by resorting to media reports and lawsuits, and General Manager Chang Joon Lee became enraged by this and ordered the abrupt cessation."

(Kwon Letter at 2). KBSA has not shown that a reasonable jury could not find that C.J. Lee terminated Samsung's video supply, at least in part, for the reasons stated in the letter. Nor have they shown that the unnamed KBSA employee did not make the alleged statements to the Samsung owners regarding C.J. Lee's reason for terminating the supply. Thus, they have neither shown that the statements concerning C.J. Lee were false, nor that the Samsung owners were aware of, or were

recklessly indifferent to, the alleged falsehood of those statements. But, most importantly of all, and it is on this ground that the Court acts, there is absolutely no showing of actual malice in connection with the Kwon letter. As with the alleged defamatory statements to the reporters, here, too, summary judgment for KBSA must be denied, based on a review of the undisputed facts in the record, granted to the counterclaim defendants.[16]

### iii.    The Blue House Complaints

In its third and last defamation claim, KBSA focuses on Hong's allegedly "false and defamatory statements concerning KBSA and Mr. C.J. Lee" in the two complaints he submitted to the Blue House. (KBSA's 56.1 ¶ 66; C.J. Lee Decl. ¶¶ 117-124). KBSA charges that these statements included libelous allegations that

---

[16]    Regardless of the qualified privilege, the Court would still reject KBSA's claim because the statements in the Kwon letter are not defamatory. The letter, in essence, alleges that C.J. Lee cut off the Samsung owners' video supply in response to threats that they had reportedly made to sue KBSA, to tarnish its good name in the press, and to wreak general havoc if KBSA did not follow their preferred course of action. If anything, this statement places the *Samsung owners* in a more negative light. C.J. Lee, in this account, comes across as no wilting flower, but his alleged response to the Samsung owner's reported threats is at least understandable—it is a natural human response to "bec[o]me enraged" in the face of such threats, and for an assertive manager to protect his employer against erratic clients. These allegations just do not tend to subject C.J. Lee to the kind of scorn, hatred, and ridicule that characterize defamatory statements, nor do they damage or disparage him in his profession. None of the other statements concerning C.J. Lee in the Kwon letter even approach libel.

KBSA was "oppressing small business . . . and in some cases destroying their livelihood," that Hong had attempted to bribe C.J. Lee after hearing that he would be receptive to such a thing, and that C.J. Lee had threatened to "make things very difficult for [the Samsung owners]" after learning of the first Blue House complaint. (KBSA's 56.1 ¶¶ 66-67). Hong admits that he submitted these complaints, but does not concede that his assertions were libelous. (Geercken Decl., Exh. J, 121:14-123:10).

KBSA offers two pieces of evidence to support its claim. First, it submits (both in English and in Korean) a printout from the Citizens' Complaint Resolution Committee, a "[South] Korean government agency," describing Hong's first complaint, and including processing information, such as the date, name of complainant, web registration number, and the names of the relevant government agencies to which the complaint would be triaged: the Korean Broadcasting System (i.e., KBS) and the Fair Trade Committee. (C.J. Lee Decl., Exh. M). Second, KBSA submits (also in both English and Korean) a form received by KBSA's headquarters from KBS's audit team investigating the issues raised in the second Blue House complaint. (*Id.*, Exh. N). This document is titled "Audit 110-72" and concerns a "[r]equest for an investigation and resolution of the attached complaint and report of the outcome." (*Id.*). It further explains that "[the] Citizen's Complaint Resolution Committee received the attached complaint concerning your company. Please review the content and reply to the complainant, and submit the outcome of the

investigation and resolution to the Audit Team." (*Id.*) Each page of the document is titled "Detailed Description of a Civil Complaint," and includes a statement explaining the background to the filing, a description of the complainant, and a list of issues requiring verification. (*Id.*). The document also includes the official seal of the Auditor of KBS. (*Id.*)

From the record evidence, there can be no genuine dispute of material fact that Hong, by submitting the Blue House complaints, initiated a quasi-judicial administrative proceeding in hope of vindicating what he believed were his legal rights without the need to file a formal lawsuit—a resort to a form of alternative dispute resolution. The Citizens' Complaint Resolution Committee appears beyond doubt to be a Korean governmental body that investigates, and attempts to resolve, civil disputes between Korean nationals at home and abroad, and/or directs such complaints to the appropriate government agency for resolution. Since the counterclaimants offer not a scintilla of evidence to the contrary, it is equally apparent that Hong submitted the two complaints with the intent of resolving his conflict with KBSA through a formal administrative process involving fact-finding, an opportunity for both sides to be heard, consideration before a neutral arbiter, and standardized forms and procedures. As such, the Blue House complaints were communications made by a party in a "quasi-judicial proceeding," and were "material and pertinent to the issue to be resolved in the proceeding." *See Wilson*, 94 A.D.3d at 756-57 (internal quotations omitted). Pointedly, Hong's two complaint

letters apprised the Korean dispute resolvers of many of the same facts alleged by plaintiffs about defendants in this lawsuit. Accordingly, any statements included in the Blue House complaints are, as *Wilson* makes clear, absolutely privileged from claims of defamation. *Id.*

The fact that the place where the formal dispute resolution occurs is not called a courtroom provides no safe harbor for defamation claims. New York courts have not limited the absolute privilege to statements made during actual judicial proceedings, but have extended it to those made during administrative proceedings as well. See, e.g., *Rosenberg v. MetLife*, Inc., 8 N.Y.3d 359, 365-68, 866 N.E.2d 439, 834 N.Y.S.2d 494 (2007) (statements regarding a brokerage firm employee's termination made to a quasi-governmental regulatory body were absolute privileged); *Kilkenny v. Law Office of Cushner & Garvey, LLP*, 76 A.D.3d 512, 513, 905 N.Y.S.2d 661, 662 (2d Dep't 2010) (statements made in letter to state bar's Grievance Committee were absolutely privileged); *Herzfeld & Stern, Inc. v. Beck*, 175 A.D.2d 689, 572 N.Y.S.2d 683 (1st Dep't 1991) (statements made to New York Stock Exchange's Department of Enforcement granted absolute immunity); *Gondal Asset Management v. N.Y. Stock Exchange*, 22 Misc.3d 1108(A), 880 N.Y.S.2d 223, at *25 (N.Y. Sup. Ct., N.Y. Cnty., 2004), *aff'd* 27 A.D.3d 271, 809 N.Y.S.2d 912 (1st Dep't 2006) (letter submitted to state Attorney General's Office opposing plaintiff's application to register as an investment advisor granted absolute immunity); *Cincu v. Asadorian*, 20 Misc.3d 1107(A), 866 N.Y.S.2d 90, at *3 (N.Y. Sup. Ct., N.Y. Cnty.,

2008) (statements made in the context of a Labor Department adjudication for unemployment insurance were absolutely privileged).

Nor have courts limited this privilege to domestic actions only. Although there is relatively scant case law on this question, courts that have confronted statements made before non-domestic agencies or adjudicators have extended the privilege to foreign proceedings. *See, e.g., Sorge v. City of New York*, 56 Misc.2d 414, 288 N.Y.S.2d 787, 790-91 (Sup. Ct., N.Y. Cnty., 1968) (statements made to Italian magistrate absolutely privileged); *Beroiz v. Wahl*, 84 Cal.App.4th 485, 493, 100 Cal.Rptr.2d 905, 910 (Ct. App. 2000) ("[A]pplying the absolute privilege to fair judicial proceedings in foreign countries encourages American citizens in these countries to resolve disputes in the courtroom, rather than by self-help, promotes the finality of judgment, and limits derivative tort litigation . . . ."); *see also Vanderkam v. Clarke*, 993 F. Supp. 1031, 1032 (S.D. Tex. 1998) (statements made before High Court of Ireland were absolutely privileged); *cf. Bakhshandeh v. American Cyanamid Co.*, 211 F. Supp. 803, 808 (S.D.N.Y. 1962) (statements made to Iranian Minister of Health granted same privilege that would apply to statements made in New York).

Adopting the logic of these cases, the Court holds that New York's absolute privilege applies to statements made in the course of a dispute resolution in foreign judicial or quasi-judicial proceedings. Here, there is no genuine dispute of material fact that Hong initiated, and was a party to, quasi-judicial proceedings before the

67

Citizen's Complaint Resolution Committee and other agencies of the government of South Korea when he submitted the Blue House complaints. The statements included in those complaints were, of course, relevant and material on their face to the administrative proceedings they instigated. Therefore, all of the statements included in the Blue House complaints are absolutely privileged. KBSA's motion for summary judgment on this libel claim is denied, [17] and, as with the other defamation claims against the Samsung owners, the Court searches the record and grants summary judgment for the counterclaim defendants.

## Conclusion

For the reasons discussed above, defendants' motion for summary judgment is granted as to all of plaintiffs' claims, except their three claims against Kong, Spring Video, and Kim for tortious interference with contractual, economic, and prospective business relations. Summary judgment is denied as to those three charges, but renewal of the motion and additional summary judgment briefing as to those claims is granted. Within 30 days of the entry on the docket of this

---

[17] In the alternative, the statements in the Blue House complaints are qualifiedly privileged, since they concern the treatment of the Samsung owners by KBSA, a subject of common interest to both Hong and the Citizen's Complaint Resolution Committee, which exists precisely to investigate such claims. KBSA has offered no evidence of malicious intent on Hong's part in submitting the complaints, and summary judgment is therefore appropriate on the ground of qualified privilege as well. *See Park Knoll Associates v. Schmidt*, 59 N.Y.2d 205, 210-11, 451 N.E.2d 182, 187, 464 N.Y.S.2d 424, 427 (1983) (applying qualified privilege to statements made by president of a tenants' association to State Division of Housing and Community Renewal, where defendant was not a party to the proceeding but had helped tenants prepare and submit complaints to the agency).

Memorandum and Order, the parties shall submit a joint briefing schedule with regard to the renewed motion.

The motion of the KBSA litigants for summary judgment as to their counterclaims for copyright infringement is denied. As to the counterclaims for libel *per se* and slander *per se*, summary judgment is denied to the KBSA litigants on the motion, and upon the Court's searching of the record, is awarded to the counterclaim defendants.

So Ordered.

Dated: Brooklyn, New York
     September 19, 2013

s/Eric N. Vitaliano

ERIC N. VITALIANO
United States District Judge